The next matter is called under docket number 122973 and 33 others. American Transmission Company v. Richard Hutchings et al., agenda number 17. Appellant, you may proceed. May it please the court, my name is Lisa Petrilli and I am here on behalf of Appellant Ameren Transmission Company of Illinois, referred to throughout the pleadings as either ATXI or Ameren. Ameren appeals the dismissal of 34 eminent domain cases from the circuit court in Edgar County, Illinois. These cases have all been consolidated on appeal by agreement of the parties because as stipulated below, all cases are based on the same set of facts and application of the same law. The circuit court dismissed the eminent domain complaints, not because the complaints failed to comply with the requirements of the Eminent Domain Act of 2007, but because the landowners, defendants, appellees in this matter, were purportedly denied due process in the Illinois Commerce Commission's proceedings, which ultimately resulted in the issuance of a Certificate of Public Convenience and Necessity, which both authorized and directed Ameren to construct, operate and maintain the Illinois Rivers Project, which is a 375 mile long high voltage electric transmission line project, which spans from the Missouri border through the state of Illinois to the Indiana border on the east. Since 2013, these landowners have asserted that they've been deprived of due process in the Illinois Commerce Commission Certificate proceedings. So the first issue that must be addressed is the process due and afforded landowners. The United States and Illinois constitutions both provide that landowners may not be deprived of property without due process, meaning that in the proceeding where the property rights are being affected, landowners must have notice and opportunity to meaningfully participate in those proceedings. Now the issue is, when do landowners become entitled to that process? And landowners' property rights are first at issue in the eminent domain proceeding, meaning that landowners' right to due process arises within the eminent domain proceeding. And that means that landowners are required to have both notice of the eminent domain proceeding and opportunity to meaningfully participate in that proceeding. And there is no dispute here in the record that landowners were provided notice of the early on through counsel and have fully participated in those proceedings. As part of your statement as to when landowners are entitled to process or due process, you said when landowners' rights are affected, are their rights not affected at the Commerce Commission hearings where determination is made that the landline can be placed over certain landowners' property? No. The purpose of the Illinois Commerce Commission's certificating procedure is essentially to act as what would be the enabling ordinance for a legislative determination of whether a particular utility project, the property of that project, as well as the route of the project. There is no taking. And this court has certainly found that there is no taking at that point in the process in its decisions in Kavanaugh, Zwick, and Zurn. And indeed, the Fourth District found citing to those cases as well, the same in Lynn and in Adams County. The first point where a property owner's rights are in jeopardy of being taken is in the eminent domain case. And that, again, is based on precedent, and in this case, I will get to, is also based on a decision from the Fourth District. And indeed, is really even more fundamental than that is this idea that there is a difference between legislative and judicial process. And what we have here are eminent domain cases that were dismissed upon a landowner's traverse and motion to dismiss. And while it's true in an eminent domain case, landowner's property rights are protected from being taken without payment of just compensation. We've not even arrived at that point in the eminent domain process. There are other rights that landowners have in an eminent domain proceeding, and the project for which the legislature, through its delegation to the Commerce Commission, have found that where there's been a determination that a project is both for a public use and the taking is necessary for that use, the landowners are permitted to challenge those findings in the eminent domain proceeding. And that is found and codified in the Eminent Domain Act of 2007. But to be clear, the judiciary's inquiry into the propriety of the project itself and the route of the project is not what may be challenged in the eminent domain proceedings. The circuit court in the eminent domain proceedings is limited in its scope to determining whether or not, when it's raised by landowners, the project was for a public use and whether the taking was necessary for that use. The landowners here, if you look throughout the record, and indeed even if you look to the courts holding in Adams County, landowners here don't dispute that the Illinois Rivers Project was necessary. They also don't dispute that it was a public project. Instead, while the landowners did raise in the first four paragraphs of their Traverse those issues in bold blanket statements that the project wasn't necessary and wasn't for a public use, those arguments, if you look to the record, were never developed. While landowners were given the opportunity to participate and conduct discovery prior to the Traverse, the landowners limited their discovery to issues of the notice provided to landowners or the lack thereof that they claimed was provided to landowners, not in the eminent domain proceeding but in the Illinois Commerce Commission's certificating proceedings. Is that a question of jurisdiction then of the trial court, subject matter jurisdiction? Certainly. The problem with this is that there is a mechanism by which the order from the Commerce Commission that granted the Certificate of Public Convenience and Necessity may be appealed if the landowners or if the parties believe that that order should not be valid. That mechanism is found in Public Utilities Act Section 10-201, and it is by direct appeal to the Fourth District in this case, because that is where the project is cited. Now, these landowners in this case appealed the certificate to the Fourth District, and the Fourth District in Adams County, in considering the landowners' issues, recognized that the landowners raised two particular issues. The landowners challenged the constitutionality of Public Utilities Act Section 8-406.1, specifically claiming that the notice provision in Public Utilities Act Section 8-406.1 was unconstitutional because it failed to provide a mechanism to provide these particular owners with actual and individualized notice of the Illinois Rivers Project, and in particular, a route that may affect their properties. The other issue that these landowners raised was that they were deprived of their right to participate in the Illinois Commerce Commission proceedings, and the Fourth District considered both of those arguments, and it is important to point out that those are the very arguments that the landowners raised in attempting to, and being successful in having the eminent domain cases dismissed, and were indeed the basis of the Circuit Court's decision to dismiss the eminent domain cases, and the Adams County, the Fourth District in Adams County specifically held that Section 8-406.1 of the Public Utilities Act was not unconstitutional, and it is clear that the appellate court considered the validity of Section 8-406.1. Indeed, it was the basis for the decision in affirming the Circuit Court's, I'm sorry, in affirming the Commerce Commission's order that was granted. Ms. Petroi, what portion of the Adams County decision discussing those property interests of landowners was dicta, and if it was, what effect does it have on a race judicata analysis? Our contention is that none of it was dicta. While there was some discussion within the opinion that the landowners may not properly be before the court, having not complied with the statutory mechanism to intervene in a Commerce Commission proceedings, the court recognized that the administrative law judge in the Commerce Commission proceedings actually acknowledged the landowner's filing, responded to the filing, and so therefore, the Fourth District found that these landowners, through the Commerce Commission's actions, were proper parties. And in fact, the Fourth District, I believe, even stated that it was good that it was going to then consider those arguments, because it believed that those arguments were properly before them. And we would contend that even if, you know, landowners had complied with the statutory requirements to intervene, certainly it is within the Fourth District's powers of review to consider the issues presented to them in review of that particular certificate. I mean, that is the very purpose for their review, is to determine whether or not the certificate was in fact valid. And as we know here, the Fourth District did find that the certificate was valid, and specifically held that these landowners had no protected property interest in the Illinois Commerce Commission's certificating procedures. Therefore, they didn't, I'm sorry, the Fourth District didn't need to go any further. If there is no right, no protectable right, there is no right to notice an opportunity to be heard. And indeed, the Fourth District, in finding that, cited two existing precedents, in fact, a hundred years of precedent, in which this Court has also found that there is no protected property interest in the Illinois Commerce Commission's certificating procedures, because there is no taking. And there is nothing to distinguish this case from that long line of cases that led to the decision in Adams County. The landowners are attempting to create a new property interest, claiming that this combination of the presumptions found and codified in the Eminent Domain Act of 2007, combined with the new expedited procedures in Public Utilities Act Section 8-406.1, somehow create a property right in the Illinois Commerce Commission's certificating procedures where one had previously not existed. The problem with this argument, if you look first at the Eminent Domain Act of 2007, is that those presumptions are merely codifications of the deferential treatment that is commonly afforded administrative agency decisions. It's also certainly reasonable in this situation where decisions of the Commerce Commission as to citing for high voltage electric transmission lines, given that it is such a technical area, should be afforded some deference. And as for the expedited procedures of Public Utilities Act Section 8-406.1, certainly that was new in 2010, but neither of those statutory provisions, the Eminent Domain changes in 2007, and the change in the Public Utilities Act in 2010, both of those existed at the time that the appellate court decided Adams County. And certainly the appellate court, again, as stated, considered the validity of Public Utilities Act Section 8-406.1. And if you go on then to go through the landowner's argument, then you have to infer that what they're saying is that the appellate court then simply wasn't aware or ignored the changes in the Eminent Domain Act of 2007, which isn't reasonable. What is reasonable is to assume that the appellate court, in issuing its decision in Adams County, was well aware of the provisions in the Eminent Domain Act and was clearly aware of the Public Utilities Act Section 8-406.1. What the circuit court and the landowners would have this court believe is that, again, there should be some change based on the combination of those two as they state new statutory inactions. But again, the Fourth District considered both of those things. And if you look at the Fourth District's decision in Adams County, the Fourth District recognized that the result of the certificating procedures may down the line be the filing of an eminent domain case where the utility or the condominor would be unable to acquire the property interest necessary for the project without agreement of the landowners. So certainly the Fourth District was aware that the end result may be an eminent domain action. And while it's not within the text of their opinion in Adams County, the Fourth District at the same time was considering a long line of cases, the Enbridge cases, and specifically the Kurth case in which the Fourth District spent a great deal of time discussing the effect of the presumptions that were codified in the Eminent Domain Act of 2007. So it's unreasonable, again, to think that the appellate court in the Fourth District in the Adams County decision didn't consider both the Eminent Domain Act and the Public Procedure Act 406.1. But indeed, even if as landowners would have you believe that this court should ignore precedent and ignore principles of res judicata and collateral estoppel, the basis for the decisions in those cases in Kavanaugh and Zwick and Zurn and in Lynn and Adams County is that there is a difference in eminent domain cases between legislative function and judicial function. And the legislature has almost unlimited authority to decide where to exercise the right of eminent domain. And certainly in this case, while it was through a delegation of that authority to the Commerce Commission, the legislature could have itself decided that this project was necessary and that this land needs to be taken and could have enacted a statute to approve the project. And certainly it would be hard to argue that landowners have a constitutionally protected right to appear on the legislative floor and participate in that process. And again, the judiciary does have a role because that right to take property for a public use isn't entirely unlimited. It must be for a public use and the taking must be necessary for that use. Again, those are issues that are not contested in this matter. And where the circuit court is essentially sitting as though it were a court of review of the 4th District's decision in Adams County, this court should preclude circuit courts from doing so and should preclude the landowners from arguing that they were, that Section 8-406.1 is unconstitutional and further preclude landowners from arguing that their due process rights were violated at the Commerce Commission, both based on precedent and the decision in Adams County, as well as the judiciary's limited role in an eminent domain proceeding. And for all those... Mr. Trella, you said that public use and public purpose are not at issue because they're not contested or it's too premature at this point? No, I mean those are proper issues that were raised by landowners in their traverse, indeed in the first four paragraphs. And as part of the hearing on the traverse, Amarant introduced evidence of the orders from the Illinois Commerce Commission, both the orders which granted the certificate as well as the later Section 8-509 orders which gave Amarant the authority to go ahead and file the eminent domain cases. And when faced with those orders, the landowners in this case declined to offer any evidence to refute the presumptions that would be created that the project is for a public use and that the taking is necessary for that use. And in fact, if you look at the record from the hearing on May 2nd, the circuit judge specifically asked and landowners conceded that if the judge were to deny landowners' motion to dismiss, he would be required to deny the traverse because the landowners had not introduced any evidence with regard to public use and public necessity. And so that hearing on traverse where they could have raised those issues and did raise those issues and could have fully developed those issues, landowners here, when faced with that opportunity, chose to do nothing and introduced no evidence. And so for that reason, Amarant Transmission Company of Illinois requested this court reverse the order dismissing the eminent domain complaints and remand with instruction to the circuit court to deny the traverse as indicated by the circuit court and to proceed to a determination of just compensation due. Well, Ms. Petrilli, I'm not quite done. You started at the outset. You described this as a transmission line from Missouri to Indiana, goes through Illinois. Is it just transmission? It is, yes. No distribution? Oh, well, there are some distribution sites along the way that are offshoots of the project, which is, and I'm not sure of all the technical details. I'm just trying to understand how the citizens of Illinois enjoy public use of this electricity. There are distribution sites, and in fact, eight of the nine segments that make up this are in service and providing benefits at this time to the citizens of Illinois. And so again, those issues could have been raised and were considered in the underlying certificate proceedings that were appealed to the 4th District. But it is certainly something that the citizens of Illinois are enjoying a benefit of the project. Now, the full benefits of the project are not being recognized because the project, you know, is a line, and it now at this point stops with the last segment yet to be constructed or in service. Are there no further questions? Thank you. May it please the Court, Mr. Petrilli, my name is Mike Reagan, and together with Craig Smith of Paris, represent all the defendant appellee farmers and landowners. Mr. Petrilli was commendably clear this morning in saying that my clients, the farmers, have no opportunity, no right, no due process right to complain about the routing of this line across their farms. I hope to convince you, at any stage of the proceeding, either in the ICC or not, and I hope to convince you that Cameron's position is wrong and that Judge Maljustice Jarman's position is correct. Before we even start, Mr. Reagan, can I just have a point of clarification? The circuit court below concluded that the landowner's due process rights were violated during the proceeding in which the Commission granted the Certificate of Public Convenience and Necessity, isn't that right? That is correct, and then he said that deprivation of due process, which occurred in the ICC, was then to be given effect in the eminent domain case, but you're correct. I'm sure you're going to get into this. Specifically, what property rights were taken or conferred when the Commission granted the Certificate of Public Convenience and Necessity? What property changed hands at that point? No property changed hands, and I won't get into it, but I am going to answer your question now, but more fully later, and that is that this case is all about, and most of these cases, almost all about, neutrality, and there was a hearing, there was an adjudicative hearing by the ICC considering all sorts of statutory criteria, and the ICC was required to come up with a decision, with findings of fact, with inclusion of law, etc., and that set the stage for then what happens in the eminent domain case, and jumping way ahead, this case is like the U.S. in which the Supreme Court said that even though in a tax sale case, the property rights were not lost until the redemption period had run, and there was a separate proceeding then, but nonetheless, that the mortgage holder, who had not been given notice, was entitled to individualized notice in the tax sale earlier on, reversing the law and establishing that so you're absolutely correct that the deprivation review process occurred in the ICC, but its effects are felt dramatically in the eminent domain case. Let me answer the jurisdiction question, since perhaps that's the place to begin. The Public Utilities Act is very clear that any person who is affected by a rural decision, etc., of the commission may appeal to the appellate court of the district in which the subject matter of the hearing is situated for the purposes of having the reasonableness or lawfulness of the decision to be determined. And additionally, in the Public Utilities Act, it states that when it is a decision challenging the lawfulness of the decision of the ICC, it's before the appellate court. The court may reverse a commission rule, regulation, or order where the court finds that the rule, regulation, or order, or decision is in violation of the state or federal constitution or laws. We know that in the eminent domain act that was, of course, before the trial court, that what can be raised and what issues are before the trial court are stated differently. It's certainly that the landowners can challenge whether or not the ICC's decision on public use was correct or not. But certainly the eminent domain statute does not indicate that the trial court under that statute has jurisdiction to consider the constitutionality of the ICC's decision. Whereas the Public Utilities Act specifically says the way to challenge the lawfulness of an ICC decision is through the appellate court in terms of administrative review. So how did the circuit court have jurisdiction to hear this issue? Knowing your interest in subject matter jurisdiction, I've prepared for that question. And so Illinois Power v. Lynn, which is a case which the other side loves, says that the fact that something was decided or could have been decided in the ICC hearing does not preempt the court from also deciding that and exercising its judicial responsibility to decide those questions again in the eminent domain case. What was the issue in Lynn? Was it perhaps public use, which is specifically allowed under the statute? It was. That was one of the two issues. And notice was not one of the issues in Lynn. But nonetheless, the general point I'm making is the fact that the ICC decides something does not preempt the court. Now, more directly to your question is Judge DeArmond was sitting as court, circuit court, with general subject matter jurisdiction, first of all. Secondly, that due process is a matter of both state and federal law. We cited the Lyon case from this court for the proposition that mere compliance with state procedure does not negate the ability to raise due process. Justice, the opinion you wrote in Grimm talks about the flexibility inherent in due process. And all of this then leads forward to the answer to your question. And decisions of due process are not only flexible, but they have to be adjusted to the circumstances of the case. And that comes from this court's case. It comes from the Supreme Court of the United States. It has to be flexible. It has to be adjustable. So a constitutional issue is so important that it can be raised in a statutory cause of action, collaterally attacking a decision that by its nature can only be appealed to the appellate court. Somehow that because it's a constitutional issue, we ignore all that, and therefore the trial court has jurisdiction over it? Not ignoring it, but Judge DeArmond and now this court is faced with the question of whether you could enter a judgment of eminent domain when it is absolutely, palpably, apparently clear that the right of these farmers to object to the no hearing whatsoever, they gave no notice, and their property rights, their due process rights were lost. Mr. Reagan, even after Belleville-Toyota, keeping with this theme, this court has been crystal clear that Illinois courts are empowered to review administrative actions, quote, only as possible, only as provided rather by law. Doesn't Section 10-201 of the Public Utilities Act specifically state that jurisdiction to review a commission decision rests with the appellate court, including whether the proceedings leading to that decision violated the Constitution? Yes. The ICC and then the appellate court thereafter certainly has the right to do that, but that does not mean that the circuit court in the eminence domain case does not, because to hold that, to say that the hands are tied of this court or of the circuit court underlying here, that that court has no power to address the deprivation of due process, which was just as plain as day here, is an affront to the concept of general subject matter jurisdiction, which is what the court had in eminence domain. The, if I can, I don't think there's any question here about notice, but I need to clear up some factual misperceptions here. None of the clients, none of my clients, none of the subsequently identified farm owners got any notice whatsoever. Amarin's suggestions reply briefly, obliquely, that there was a clerk's list which listed landowners, etc., and they asked you to presume that it was mailed. I asked you to read the list. There's nothing in the clerk's list which says anything about its ever having been mailed, which is what Judge Jarman found as well, and in fact, that list says that because of the large number of owners here, that they weren't including the names of all the owners, and the list does not even say it was ever mailed, and it said that it's going to be available on the website. Of course, my clients had no reason to ever go look at the website there. Did your clients participate in any way in the ICC proceedings? Maybe one or two of them participated in the beginning, a line through Edgar County. I can't answer your question, frankly, as to what may have been done then, but the lines that were disclosed, the original route and the alternate route were miles and miles away from our land, and so, of course, the clients chose not to participate because there's no reason to. There's 399,000 acres in Edgar County, and none of them were involved on that line. Were they involved in the Adams County Appeal? They were. Some of them were, not all of them. And does that make a difference? It does not, and for this reason. First of all, they were in the Adams County Appeal only by the skin of their teeth. They found out about the line going across their land after the ICC ordered, when they got a letter from Ameren, which says, we're coming to talk to you, and coming to talk to you means we'd like an easement, can't buy it, we're going to take it to Ameren. They hired Mr. Smith, or at least contacted Mr. Smith the next day, and he did Gilman's work to get quickly to work, attempted to intervene and attempted to say, look, I want to bring evidence in the ICC case, and that was denied. Every attempt he made to intervene in the ICC case was denied, and so right at the end they said, okay, we're going to let you intervene for the purpose of appeal. But that was it. He had no substantive right, and then they just said that. Then the Adams County 4th District opinion said fundamentally that, look, you're not even here, we don't believe that you're properly here, but we're going to go on and decide this due process question anyway. And so the question was asked earlier, you know, was that dicta, the definition of dicta, is it necessary to the decision? It's not, but, you know, that's for the court to decide, but I think that Justice Harrison of the 4th District was really saying, you don't have any rights here, but we're going to go ahead and talk about it anyway. If I addressed that question. So is there any race judicata issue here? We addressed that, I think, starting at page 31 of the complaint. Race judicata and collateral estoppel are both branches of the same doctrine, and it is equitable in nature. This court's made that very clear. We then, the Amherst brief says we have met all of the elements for both race judicata and collateral estoppel, but this court in Tallarico and other cases and the appellate court abundantly says that those are just the threshold requirements, you have to establish all those elements to even be allowed to talk to us, but then we have to decide whether or not it is fair to apply preclusive doctrines here, and we have set out sections 26 and 28 of the restatement section of judgments, which directly say, suggest respectfully to the court, that preclusion should not be applied here, and so section 26 says that, you know, if it would, if to do so would not be a fair and equitable implementation of a statutory or constitutional scheme, then you should not do it, and section 28 says that if there are, if the issue is one of the law, which it is here, then we have the right to notice, and a new determination is warranted in order to take into account an intervening change in the legal context, or otherwise to avoid an equitable administration of the law, then don't apply the doctrines. And that's premised on the fact that the original request was for different land. Yes. And if you were representing the original landowners, you wouldn't be making this argument, is that right? That's actually true, yeah. No, that's actually true, but we had no ability to participate. This case is all about rule. This case is all about rule. And, you know, we've had no rights. They say, you know, we had no right to notice, no right to participate. This is only legislative. And let me go to that if I could here. They say that the ICC acts legislatively. Well, this court recognizes in its standard of review cases and elsewhere that a legislative body can also act in quasi-judicial or administrative fashion. And that's what occurred here. So the legislature told the ICC in these rooted cases, and there's just this narrow question, this narrow type of case before you today. And they said that, first of all, you have a hearing. You have to make highly specific factual findings, quote, after notice in hearing. And so it's a statutory interpretation question, but that's also where the due process interpretation comes in. That's been after notice in hearing. Then you can grant the certificate of public convenience and necessity. And so there are many findings which the ICC is charged with making, including least cost means. That's a term I've learned in this case. But it turns out that the ICC and the cases in Adams County says, okay, there's 12 criteria which go into evaluating least cost means, and those include environmental impacts, impacts on historical resources, social and land use impacts, the number of affected landowners and other stakeholders, proximity to homes and structures, community acceptance, and visual impact. These are the things that go into this factual determination. The commission is required to issue its decision, not make a legislative determination, but to issue its decision with, quote, findings of fact and conclusions of law. And this rooting hearing has all the characteristics of an adjudication. There's discovery, there's expert disclosure, there's expert testimony, lay testimony, cross-examination, briefs, reply briefs, the written decision I referred to, re-hearings are provided for, and, of course, then a public review. Because this is an adjudication, even by nominally a legislative body, then what adheres to that is the right to due process. So what this case comes down to is the essential position of the utility is that the landowners have no right to a hearing before the CPCN is granted. If they happen to be there, great. But if it turns out in this case that they just didn't get notice, well, that's not a problem whatsoever. So think about their position. Think about what you would be doing if you were the person. Their position that it was too early in the ICC hearing and in the Adams County appeal, it was too early for us to listen to your due process rights, and now it is too late. And so it was too early then, and it is too late today, and, therefore, no due process rights whatsoever. Mr. Regan, in your brief, you mentioned a number of legislative changes that have been made to both the Eminent Domain Act and the Public Utilities Act since cases Cavanaugh and Zurn were decided. Yes. Do any of those changes allow for a result in a transfer of property rights during the certification proceedings? They do not. They do not directly address that. So I would like to, in the brief time remaining, just talk about the relief to be afforded here, that it is both fair, simple, and practical. And no relief, we don't request any relief other than the affirmance of the trial court. Now, if that happens, Ameren can file a new docket, which I've learned is what they call a case, and file a new docket with the ICC on just this Edgar County segment. Mr. Trilley told you this morning that the line's been built. Tom Ed says, look, if you affirm this, the whole project goes back and we have to start over, and that's simply hyperbole. That's not true. It's all been built. All that remains is 25 miles from a substation in Kansas, Illinois, which is in Edgar County, 25 miles to the Indiana border. And there was already a refiling of a docket in this case. The routing on this whole project that was rushed was so poor that the line was going to go too close to an FAA facility, and they had to go back and start over on that, and even the ICC says, look, there's parts of this we're not going to decide. So the easy answer upon affirmance of the trial court is that Ameren simply has to go back, file a new docket, and give our clients the right to speak to the ICC, not to the trial court here, speak to the ICC about the lease cost means and all of that evidence. There is no impediment to such a refiling. They have already done it here on this line. The ICC won't be surprised by that at all. It is stunning reading in this case when they talk about the propriety of their decision to see what they thought about it, and I ask the court to also take notice that the ICC has not sought to do anything in this case. Thank you very much. Thank you. Rebuttal. Thank you. The ramifications of the circuit court's actions in this case and the ramifications that this court affirms the circuit court's holding are not simple at all. It's not that Ameren can just simply go back to the Commerce Commission. The results of the decision that would affirm the circuit court's order in this case would create a new constitutionally protected right for potentially affected landowners to participate in the legislative process. That goes well beyond what this court, and again what statutorily goes beyond what this court has found is required by the constitution in eminent domain cases and even in certificating proceedings. The appellees are asking that this court ignore the existing case law, and if you look specifically at, there was a question related to the notice that these landowners received. To be clear, the legislature in enacting Public Utilities Act Section 8-406.1 clearly balanced two potentially competing interests. There is on one hand this interest in having this expeditious procedure by which the Commerce Commission may approve what's been deemed a publicly necessary utility project, and on the other hand there's this statutory enactment, this desire to encourage public participation in those proceedings, and indeed an attempt to provide notice to the most amount of people. In balancing those two competing interests, the legislature added notice provisions to Section 8-406.1 that didn't exist in Section 8-406. Those notice proceedings required that the utility publish notice of the project in the area where the project was proposed, and also hold a minimum of three public meetings by which property owners could attend to learn about the utility's proposed projects. In this case, that notice provision achieved its desired effect. It's admitted in the materials that some of these landowners learned about the project and attended those public meetings. Now, the mistake that was made wasn't that the utility, it wasn't that AMRIN or the ICC failed to comply with the statutory notice requirements. Indeed, all parties admit that both the utility and the commission complied with the statutory notice, but what the landowners did here was attend the public meetings, see that the utility was proposing two routes that didn't appear to affect their property, and assumed that the Commerce Commission would just adopt one of the routes that was being proposed. So they declined to move to participate, they declined to monitor it, which can easily be done through the Commerce Commission's website. Why would they do that, Counsel, if they didn't think their land was at issue? Well, that's a mistaken assumption of the ICC process. See, the ICC is not, their authority from the legislature wasn't enacted so that they could simply rubber stamp the proposed projects of the utilities. They act as a fact-finding entity in those hearings and serve that legislative function to determine themselves what is, whether a project, the propriety of the project, as well as the route of the project. And so that's why notice was given, and the statute itself required notice not just be mailed to the people on those proposed routes, but also be given to the general public. Because the legislature recognized that while the utility may propose a route, the Commerce Commission, which is the legislative authority, might not believe that that particular route serves a public use or is necessary. And so here we, I mean, we agree, though, if you set aside the issues of Breast Judicata and collateral estoppel that arise because of the Adams County decision, in considering the validity of that Commerce Commission order, which, by the way, if there was a problem with the order and the validity of the order, which included, you know, approval of the project as well as the route, that was properly appealed and should have been properly appealed to the 4th District. But even ignoring that decision, we agree that it doesn't matter whether the landowners appeared in the Commerce Commission proceedings. It doesn't matter whether they appeared in Adams County. Landowners and the Circuit Court are certainly free to raise issues of public use and public necessity in the eminent domain case. That's the decision in Linn. The landowners don't lose anything, don't lose any property rights by failing to appear in the Commerce Commission proceedings or in the appeal. But in the eminent domain proceedings, aren't they fighting a presumption? They are, although that is a presumption that would exist even if this decision wasn't through a delegation of authority to the Commerce Commission. In an eminent domain proceeding where the legislature or municipality decides to enact or to use eminent domain, it essentially would pass either an enabling statute or an enabling ordinance. And the introduction into evidence at a traverse hearing in an eminent domain case of that ordinance itself establishes a prima facie case. It essentially creates the same burdens that are codified within the Eminent Domain Act of 2007. And again, those principles aren't new or something that didn't exist prior to the Eminent Domain Act of 2007. Deferential treatment to administrative decisions and indeed in eminent domain proceedings to the legislature's determination of where it believes it's necessary to exercise eminent domain are rightfully afforded deference. Now, none of that matters so much in this case because the landowners here didn't introduce any evidence.  They declined to introduce any evidence to refute that the project was both for a public use and was necessary for that use. And it's clear if you look at the briefing in this case by landowners and also by the Farm Bureau who appeared filing an amicus brief, it's clear that what they're asking you to do is to ignore the decision in Adams County. They are asking this court to agree that the circuit court somehow sits in a position of review of the 4th District's decision in Adams County which was provided properly by statute and in which these landowners participated. And again, for all those reasons, Ameren Transmission Company of Illinois requests that this court reverse the decision to dismiss these cases and remand for a determination that the traverse be denied and for a determination of just compensation. Thank you. Thank you. Case numbers 122973 on the consolidated 33 cases Ameren Transmission v. Hutchings et al. will be taken under advisement as agenda number 17. Ms. Petrelli, Mr. Reagan, we thank you for your arguments today. You're excused with our thanks.